# United States Court of Appeals
# for the Federal Circuit

---

**SUPREMA, INC.,
MENTALIX INCORPORATED,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**CROSS MATCH TECHNOLOGIES, INC.,**
*Intervenor*

---

2012-1170

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

---

Decided: August 10, 2015

---

DARRYL MICHAEL WOO, Vinson & Elkins LLP, San Francisco, CA, argued for appellants. Also represented by ILANA RUBEL, BRYAN ALEXANDER KOHM, DAVID MICHAEL LACY KUSTERS, HEATHER N. MEWES, ERIN SIMON, Fenwick & West, LLP, San Francisco, CA; JAE WON SONG, Mountain View, CA; BRADLEY THOMAS MEISSNER, Seattle, WA.

CLARK S. CHENEY, Office of the General Counsel, United States International Trade Commission, Washing-

ton, DC, argued for appellee. Also represented by DOMINIC L. BIANCHI, ANDREA C. CASSON, CLINT A. GERDINE, WAYNE W. HERRINGTON.

MAXIMILIAN A. GRANT, Latham & Watkins LLP, Washington, DC, argued for intervenor. Also represented by CLEMENT J. NAPLES, New York, NY; GABRIEL BELL, BERT C. REISER, JENNIFER HALBLEIB, Washington, DC.

MARK R. FREEMAN, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for amicus curiae United States. Also represented by JOYCE R. BRANDA, SCOTT R. MCINTOSH.

JAMES ALTMAN, Foster, Murphy, Altman & Nickel, PC, Washington, DC, for amicus curiae American Intellectual Property Law Association. Also represented by F. DAVID FOSTER.

J. MICHAEL JAKES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington DC, for amicus curiae Intellectual Property Owners Association. Also represented by HERBERT CLARE WAMSLEY, JR., Intellectual Property Owners Association, Washington, DC; PHILIP STATON JOHNSON, Johnson & Johnson, New Brunswick, NJ; KEVIN H. RHODES, 3M Innovative Properties Company, St. Paul, MN.

CONSTANTINE L. TRELA, JR., Sidley Austin LLP, Chicago, IL, for amicus curiae Microsoft Corporation. Also represented by RICHARD ALAN CEDEROTH, DAVID T. PRITIKIN, Chicago, IL; BRIAN R. NESTER, RYAN C. MORRIS, Washington, DC; THOMAS ANDREW CULBERT, DAVID E. KILLOUGH, Microsoft Corporation, Redmond, WA.

JOHN THORNE, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, for amici curiae Dell Inc., Adobe Systems, Inc., Ford Motor Co., Hewlett-

Packard Co., LG Display Co., Ltd., LG Electronics, Inc., Netflix, Inc., Samsung Electronics Co., Ltd., SAP America, Inc. Also represented by AARON M. PANNER, MELANIE L. BOSTWICK.

DARYL JOSEFFER, King & Spalding LLP, Washington, DC, for amicus curiae Google Inc. Also represented by ADAM CONRAD, Charlotte, NC; SUZANNE MICHEL, Google Inc., Washington, DC.

ERIC JAY FUES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, for amicus curiae International Trade Commission Trial Lawyers Association. Also represented by T. CY WALKER, Kenyon & Kenyon LLP, Washington, DC.

JOHN D. HAYNES, Alston & Bird LLP, Atlanta, GA, for amici curiae Nokia Corporation, Nokia USA, Inc. Also represented by ADAM DAVID SWAIN, Washington, DC.

———————

Before PROST, *Chief Judge,* NEWMAN, LOURIE, DYK, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, and HUGHES, *Circuit Judges.*[*]

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* O'MALLEY, with whom PROST, *Chief Judge*, LOURIE and DYK, *Circuit Judges*, join.

———————

[*] Circuit Judges Moore and Stoll did not participate.

REYNA, *Circuit Judge.*

Section 337 of the Tariff Act of 1930, codified at 19 U.S.C. § 1337 ("Section 337"), declares certain acts unlawful. Among them is importing "articles that . . . infringe a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(i). The International Trade Commission ("Commission") interpreted this provision to cover importation of goods that, after importation, are used by the importer to directly infringe at the inducement of the goods' seller. A majority panel of this court disagreed, reasoning that there are no "articles that infringe" at the time of importation when direct infringement does not occur until after importation. *Suprema, Inc. v. Int'l Trade Comm'n*, 742 F.3d 1350, 1352 (Fed. Cir. 2013). In doing so, the panel effectively eliminated trade relief under Section 337 for induced infringement and potentially for all types of infringement of method claims.

We granted en banc rehearing and vacated the panel decision, 2014 WL 3036241, and we now uphold the Commission's position. We conclude that because Section 337 does not answer the question before us, the Commission's interpretation of Section 337 is entitled to *Chevron* deference. We hold that the Commission's interpretation is reasonable because it is consistent with Section 337 and Congress' mandate to the Commission to safeguard United States commercial interests at the border. Accordingly, we return the case to the panel for further proceedings consistent with this opinion.

## I. BACKGROUND

This case comes before us on appeal from a final determination by the Commission, finding a violation of Section 337 by Suprema, Inc., and Mentalix, Inc., in *Certain Biometric Scanning Devices, Components Thereof, Associated Software, and Products Containing the Same*, Inv. No. 337-TA-720. Section 337 authorizes the Commission to investigate allegations of unfair trade acts in the

importation of articles that infringe a valid United States patent. 19 U.S.C. § 1337(b)(1). If a violation of the statute is found, the Commission issues an exclusion order that bars the importation of some or all of the infringing products and may issue a related cease and desist order unless the Commission finds that certain public interest factors militate against such remedy. *Id.* § 1337(d).

In May 2010, Cross Match Technologies, Inc. ("Cross Match") filed a complaint with the Commission, alleging infringement of four patents owned by Cross Match involving certain fingerprint scanning devices. The Commission found the scanners to be manufactured by Suprema abroad, and imported into the United States by both Suprema and Mentalix. Mentalix subsequently combined the scanners with software, and used and sold the scanners in the United States.

Cross Match is the assignee of several patents covering technology used in biometric imaging scanners including U.S. Patent Nos. 7,203,344 ("the '344 patent"), the only patent relevant to this appeal. The claims of the '344 patent are drawn to fingerprint scanning systems and methods that generate a fingerprint image, process that image to identify key regions, and determine image quality. Claim 19, the sole claim remaining in this appeal, recites:

> 19. A method for capturing and processing a fingerprint image, the method comprising:
>
> (a) scanning one or more fingers;
>
> (b) capturing data representing a corresponding fingerprint image;
>
> (c) filtering the fingerprint image;
>
> (d) binarizing the filtered fingerprint image;

(e) detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image;

(f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image; and

(g) determining whether the detected fingerprint area and shape are of an acceptable quality.

'344 patent col. 19 ll. 24–37.

Suprema, Inc., is a Korean company that makes hardware for scanning fingerprints, including its RealScan line of fingerprint scanners. Suprema sells the scanners to Mentalix, Inc.[1] The scanners are not stand-alone products. To function, they must be connected to a computer, and that computer must have custom-developed software installed and running. Suprema does not make or sell this software. Instead, it ships each scanner with a "software development kit" ("SDK") that is used for developing custom programs that control the functions of its scanners. The SDK comes with an instruction manual that explains how programs can be written to take advantage of scanner functionality.

Mentalix, Inc., is an American company that purchases Suprema's scanners and imports those scanners into

---

[1] Suprema separately imports scanners into the United States. Suprema displays these scanners at trade shows and uses them to obtain a certification under the United States Federal Bureau of Investigation's Integrated Fingerprint Identification standard. Suprema Answer at 13. Those importations are not relevant to the issue before us.

the United States. It writes custom software, called FedSubmit, which uses Suprema's SDK to control and operate the scanners. Mentalix then bundles its software with the scanners and resells the bundle within the United States.

The Commission instituted an investigation of Suprema's accused scanners in June 2010 pursuant to 19 U.S.C. § 1337(a)(1)(B)(i). 75 Fed. Reg. 34482–83 (June 17, 2010). Section 337(a)(1)(B)(i) declares unlawful the importation, sale for importation, or sale within the United States after importation of articles that infringe a valid and enforceable United States patent. An administrative law judge ("ALJ") construed certain terms of claim 19 of the '344 patent and then conducted a thorough infringement analysis, expressly finding that each of the limitations of claim 19 was practiced by the accused products. *See* J.A. 123–32. On the basis of that finding, the ALJ determined that several Suprema scanners, the RealScan-10, RealScan-D, RealScan-10F, and RealScan-DF, directly infringe claim 19 of the '344 patent when used with the SDK kits and Mentalix's FedSubmit software. J.A. 133.

Based on the finding that the '344 patent was infringed, the ALJ issued a Final Initial Determination that there had been "a violation of section 337 in the importation into the United States, sale for importation, and sale within the United States after importation of certain biometric scanning devices" and "associated software." J.A. 205. The ALJ recommended that a limited exclusion order issue that would bar Suprema's infringing scanners from entering the United States.[2] *Id.* The ALJ further recommended that a cease-and-desist order issue to

[2] A limited exclusion order is directed solely to Suprema imports and does not affect importations of scanning products manufactured by other foreign entities.

prevent Mentalix from distributing the infringing scanners. *Id.*

In June 2011, the Commission determined to review the ALJ's Final Initial Determination of infringement of claim 19 of the '344 patent. J.A. 209. The Commission requested briefing on the issues under review, and "requested written submissions on the issues of remedy, the public interest, and bonding from the parties and interested non-parties." J.A. 210 (citing 76 Fed. Reg. 52970–71 (Aug. 24, 2011)). In addition to considering the issue of direct infringement, the Commission also considered whether Suprema induced infringement of claim 19. The Commission's comprehensive analysis included a survey of the relevant law, a summary the ALJ's decision, and an extensive discussion of the parties' arguments.

Regarding direct infringement, the Commission found that record evidence demonstrated that Mentalix had already directly infringed claim 19 within the United States prior to the initiation of the investigation. Mentalix's direct infringement arose from its integration of FedSubmit software with Suprema scanners and SDK kits, and subsequent use of the combination within the United States. J.A. 220.

Turning to the issue of indirect infringement, the Commission examined the elements required to support an inducement finding, in addition to underlying direct infringement. In particular, the Commission considered the inducer's knowledge regarding patent infringement. The Commission explained that the knowledge prong is met by a showing of willful blindness. J.A. 221 (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070–71 (2011)). The Commission laid out the requirements for willful blindness: (1) the defendant's subjective belief in the high probability that a fact exists; and (2) the defendant's taking of deliberate steps to avoid learning of that fact. *Id.* (citing *Global-Tech*, 131 S. Ct. at 2070).

The Commission found that Suprema "'willfully blinded' itself to the infringing nature of Mentalix's activities," which Suprema "had actively encouraged." J.A. 221. Though much of the relevant evidence is confidential and cannot be repeated here, the Commission found that Suprema believed in high probability that its scanners would infringe the '344 patent. For instance, the Commission found that Suprema was successful in its attempts to develop various functions covered by the '344 patent into its products. J.A. 222. Based on these factual findings, the Commission found that Suprema subjectively believed in the high probability that Cross Match's scanner technology was patented and, therefore, that it was likely that Suprema's scanner products would be covered by Cross Match's patents. J.A. 224.

The Commission also found that Suprema deliberately avoided acquiring knowledge of the '344 patent.[3] Among other things, the Commission found that Suprema failed to obtain opinion of counsel, through which the '344 patent would have been uncovered since it was owned by Cross Match, and the search would have included an analysis of whether Suprema infringed Cross Match patents. J.A. 224. Accordingly, the Commission found that Suprema had willfully blinded itself to the existence of the '344 patent and "deliberately shielded itself from the nature of the infringing activities it actively encouraged and facilitated Mentalix to make." J.A. 225.

As to the active encouragement and facilitation requirement, the Commission listed numerous confidential examples of the collaborative efforts of Suprema and Mentalix, noting the list was not exhaustive. J.A. 225. Based on this extensive evidence, the Commission found that Suprema aided and abetted Mentalix's infringement

---

[3]    The finding was based on confidential evidence that we do not publicly discuss.

by collaborating "with Mentalix to import the scanners and to help adapt Mentalix's FedSubmit software to work with Suprema's imported scanners and SDK to practice claim 19 of the '344 patent." J.A. 225. Thus, the Commission found that all the elements of induced infringement had been met. The Commission modified the ALJ's initial determination such that Mentalix was found to directly infringe claim 19 of the '344 patent, establishing the underlying direct infringement, and Suprema was found to induce infringement of claim 19. J.A. 233.

Upon determining Section 337 was violated, the Commission considered the appropriate enforcement action. It agreed with the ALJ that the appropriate relief included a limited exclusion order covering infringing scanners, associated software, and products containing the same that were manufactured overseas by or imported by or on behalf of Suprema or Mentalix, or any entity affiliated with either company. J.A. 235. Thereupon, the Commission issued the limited exclusion order and terminated the investigation.

Suprema and Mentalix appealed several of the Commission's findings to this court, including the findings of direct and indirect infringement of claim 19 of the '344 patent. They further requested that the Commission's limited exclusion order be vacated.

A divided panel of this court vacated the Commission's findings that Mentalix directly infringed the '344 patent and that Suprema induced infringement of the '344 patent. *Suprema, Inc. v. Int'l Trade Comm'n*, 742 F.3d 1350 (Fed. Cir. 2013). The majority reasoned that Section 337's language, "articles that infringe," is a temporal requirement and that infringement must be measured at the time of importation. *Id.* at 1363. It concluded that the Commission lacks authority under Section 337 to issue an exclusion order predicated on induced infringement because such imports are not in an infringing state

upon importation. *Id.* at 1357. Thus, the majority vacated all of the Commission's infringement findings as to the '344 patent and the limited exclusion order based on those findings. *Id.*

Cross Match and the Commission petitioned for rehearing en banc. We granted the petition to consider whether the Commission correctly concluded that unfair trade acts covered by Section 337 include the importation of articles used to infringe by the importer at the inducement of the articles' seller. The United States Department of Justice and numerous Amici filed briefs. Oral arguments were heard on February 5, 2015.

## II. Discussion

United States trade laws have long afforded trade relief to domestic industries from a range of unfair trade practices. The commercial effect of international trade acts and practices has been a major congressional concern since the founding of our nation. In the second Act passed by the first United States Congress, the Tariff Act of 1789, Congress found that the imposition of duties on imports was "necessary for . . . the encouragement and protection of manufactures." Act of July 4, 1789, ch. 2, § 1, 1 Stat. 24, 24. Since 1789, Congress has been vigilant both to encourage and protect U.S. domestic interests in connection with unfair commercial activity involving foreign imports, a vigilance that in 1922 led to the passage of Section 316, the predecessor of Section 337. *See* Tariff Act of 1922, ch. 356, § 316(a), Pub. L. No. 67-318, 42 Stat. 858 (1922). Section 316 declared unlawful "unfair methods of competition and unfair acts in the importation of articles into the United States." *Id.* at 943.

Section 337, the modern statutory section, is codified at 19 U.S.C. § 1337. As a trade statute, the purpose of Section 337 is to regulate international commerce. *Id.* at 858 (explaining purpose of Act enacting precursor to Section 337 was "to regulate commerce with foreign

countries"); Pub. L. No. 71-361, 46 Stat. 590, 590 (1930) (same). Section 337 necessarily focuses on commercial activity related to cross-border movement of goods. *See, e.g.*, 19 U.S.C. §§ 1337(a)(1)(B) (imported goods infringing patents or copyrights), (a)(1)(C) (imported goods infringing a trademark), (a)(1)(D) (imported goods infringing a mask work), (a)(1)(E) (imported goods infringing design rights). While Congress has addressed domestic commercial practices under various statutory regimes, such as antitrust (15 U.S.C. §§ 1–38), patent (35 U.S.C. §§ 1–390), and copyright (17 U.S.C. §§ 1–1332), it has established a distinct legal regime in Section 337 aimed at curbing unfair trade practices that involve the entry of goods into the U.S. market via importation. In sum, Section 337 is an enforcement statute enacted by Congress to stop at the border the entry of goods, *i.e.*, articles, that are involved in unfair trade practices.

Section 337 declares certain activities related to importation to be unlawful trade acts and directs the Commission generally to grant prospective relief if it has found an unlawful trade act to have occurred. Subsection (a) identifies several types of acts as unlawful, one of which relates to infringement of a U.S. patent. Specifically, the statute provides:

> (a)(1) . . . [T]he following are unlawful, and when found by the Commission to exist shall be dealt with . . . as provided in this section:
>
> . . . .
>
> (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of *articles that—*
>
>> (i) *infringe* a valid and enforceable United States patent or a valid

> and enforceable United States
> copyright registered under title 17
> . . . .

§ 1337(a)(1)(B)(i) (emphases added). Section 337 directs the Commission to "investigate any alleged violation of this section on complaint," including allegations of importing articles that infringe. *Id.* § 1337(b)(1). After concluding the investigation, the Commission is required to "determine . . . whether or not there is a violation of this section." *Id.* § 1337(c). If it finds a violation under subsection (a), subsection (d) obligates the Commission to fashion prospective relief, typically involving the Commission directing that certain articles be excluded from entry into the U.S, "unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry." *Id.* § 1337(d)(1). Under the statutory provisions at issue, proof of quantifiable harm is not an element of liability, and monetary damages are not available as relief.

We are asked to decide whether goods qualify as "articles that infringe" when the Commission has found that such goods were used, after importation, to directly infringe by the importer at the inducement of the goods' seller. In other words, does the importation of such goods qualify as an unfair trade act under Section 337? If the answer is yes, the Commission has authority under § 1337(d)(1) to issue an exclusion order to prevent this act from occurring in the future.

We begin with our standard of review, and what deference, if any, is owed to the Commission's interpretation of Section 337. There is no dispute that Congress has delegated authority to the Commission to resolve ambiguity in Section 337 if the Commission does so through

formal adjudicative procedures. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1363 (Fed. Cir. 2004) ("To the extent that there is any uncertainty or ambiguity in the interpretation of . . . § 1337(a)(1)(B)(ii), deference must be given to the view of the agency that is charged with its administration."); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381–83 (Fed. Cir. 1998). The Commission's investigations under Section 337 require "adequate notice, cross-examination, presentation of evidence, objection, motion, argument, and all other rights essential to a fair hearing," 19 C.F.R. § 210.36(d), thus satisfying *Mead*'s formality requirement. Accordingly, we review the Commission's interpretation pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The *Chevron* framework is well-established. *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013) (explaining *Chevron*'s "now-canonical formulation"). *Chevron* requires a court reviewing an agency's construction of a statute which it administers to answer two questions. *Chevron*, 467 U.S. at 842. The first is "whether Congress has directly spoken to the precise question at issue." *Id.* If the answer is yes, then the inquiry ends, and we must give effect to Congress' unambiguous intent. *Id.* at 842–43. If the answer is no, the second question is "whether the agency's answer [to the precise question at issue] is based on a permissible construction of the statute." *Id.* at 843. The agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citing *Mead*, 533 U.S. at 229–30).

## A. *Chevron* Step One

*Chevron*'s framework begins with the language of the statute. *DIRECTV Grp., Inc. v. United States*, 670 F.3d

1370, 1381 (Fed. Cir. 2012). As explained below, the shorthand phrase "articles that infringe" does not unambiguously exclude inducement of post-importation infringement.

By using the word "infringe," Section 337 refers to 35 U.S.C. § 271, the statutory provision defining patent infringement. The word "infringe" does not narrow Section 337's scope to any particular subsections of § 271. As reflected in § 271 and the case law from before and after 1952, "infringement" is a term that encompasses both direct and indirect infringement, including infringement by importation that induces direct infringement of a method claim. *See* 35 U.S.C. § 281 (remedy for infringement); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001).

Section 337 refers not just to infringement, but to "*articles* that infringe." That phrase does not narrow the provision to exclude inducement of post-importation infringement. Rather, the phrase introduces textual uncertainty. Simply put, the phrase "articles that infringe" does not map onto the Patent Act's definition of infringement. In its amicus brief to us, the United States describes the disparity as one arising from the *in rem* language of Section 337 and the *in personam* language of § 271. *See* U.S. Amicus Br. 10–14.

The relevant portions of § 271 define persons' *actions* as infringement. *See, e.g.*, 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent."); § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); § 271(c) ("Whoever offers to sell or sells . . . a component of a patented machine . . . shall be liable as an infringer."). An "article" cannot infringe under any subsection of § 271. The disparity between the language of Section 337 and the Patent Act's definitions of infringement presents uncer-

tainty requiring resolution by the agency charged with Section 337's enforcement. Congress has not provided an unambiguous resolution, much less one that excludes the inducement at issue here.

Suprema argues that, because Section 337 refers to articles, the only bases for infringement under Section 337 come from 35 U.S.C. §§ 271(a) and (c), which refer to "any patented invention" and "a component" of a patented machine, respectively. Appellant's Br. at 30–31. Suprema's argument fails to recognize that inducement, like contributory infringement, is commonly based on the provision of articles. *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920 (2015); *Global Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011). Still, we need not decide whether Suprema's interpretation might be a reasonable resolution of the textual dilemma presented by mapping Section 337 onto § 271. We cannot find that Congress prescribed Suprema's view, and hence we cannot adopt such an interpretation at *Chevron* Step One. Under §§ 271(a) and (c), it is not articles that infringe, but actions that infringe.

Moreover, Suprema has not shown that the phrase "articles that infringe" has a clearly established usage limited to product claims or to direct or contributory infringement, much less a usage that excludes induced infringement of a method claim. To the contrary, various forms of shorthand references to devices that infringe have often been used without such narrowed meaning.[4]

---

[4]    *See, e.g.*, *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1049, 1050–51, 1057, 1058, 1059 (Fed. Cir. 2014); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1374 (Fed. Cir. 2013); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 65, 71, 78–79, 81 (Fed. Cir. 2012); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327–30 (Fed. Cir. 2010); *Lucent Technol-*

We therefore cannot conclude that Congress, in using the Section 337 phrase, did so with an unambiguous meaning for how it applies to § 271.

Citing the present-tense use of the verb "infringe" in the phrase "articles that infringe," the panel suggested that Section 337 must exclude inducement of post-importation infringement because the acts that complete infringement have not all taken place at the time of importation. *Suprema*, 742 F.3d at 1358. It is true that the direct infringement required for inducement, *see Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 & n.3 (2014), will typically not have taken place at the time of the importation that induces it. Yet we cannot conclude that Congress unambiguously excluded such induced infringement on the basis of the panel's reasoning.

For contributory infringement, as for inducement, direct infringement is necessary and will typically take place later than the accused indirect infringer's act. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961). The panel recognized that Section 337 could fairly reach contributory infringement. *See, e.g., Suprema*, 742 F.3d at 1361, n.4. As that recognition confirms, Section 337's present-tense language is readily

---

*ogies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309, 1320–23, 1336, 1338 (Fed. Cir. 2009); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337–42 (Fed. Cir. 2008); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1308–10 (Fed. Cir. 2006); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365–66 (Fed. Cir. 2003); *RF Delaware, Inc. v. Pac. Keystone Technologies, Inc.*, 326 F.3d 1255, 1268 (Fed. Cir. 2003); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1342 n.2, 1343–44 (Fed. Cir. 2001); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 666–68 (Fed. Cir. 1988).

susceptible to being read as satisfied by the indirect infringer's own acts, including importation that is part of inducement or contribution. *See National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1194–96 (Fed. Cir. 1996) (inducing act must occur after patent issues to support inducement liability; not enough that induced act occurs after issuance); *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., Ltd.*, 754 F.2d 345, 348 (Fed. Cir. 1985) ("[L]iability [arises] as of the time the [inducing] acts were committed, not at some future date determined by the acts of others.") (emphasis omitted).

Reading the statute unambiguously to require that infringement occur at the time of importation would have produced absurd results under the pre-1994 version of § 271(a). Such a reading would mean that Congress, when it enacted the language at issue in 1988, excluded even the ordinary case of direct infringement. At that time (before 1994), § 271(a) did not define importing a patented invention (or the offer to sell a patented invention) an infringing act. Section 271(a) only covered making, using, and selling, and those actions had to occur in the United States. 35 U.S.C. § 271(a) (1988). At least for ordinary importations involving goods that enter the United States for a later use or sale, none of the activities encompassed by the former § 271(a) would have occurred in the United States at the time of importation. If Congress meant to forbid the Commission from looking past the time of importation in defining Section 337's reach, Section 337 would not have reached even garden-variety direct infringement. Even if Section 337(a)(1)(B)'s clause covering post-importation sales allowed assessment of infringement after importation, Section 337 would not have covered the ordinary case of post-importation use without post-importation sales. We cannot attribute that result to Congress.

The panel also reasoned that Section 337's remedial provision allowing for an exclusion order demonstrates

that Section 337's "focus is on the infringing nature of the articles *at the time of importation.*" *Suprema*, 742 F.3d at 1358–59 (emphasis added). Section 337 refers to the Commission's authority to issue an exclusion order against "the articles concerned." *Id.* at 1359 (quoting Section 337(d)(1)). The panel asserted that the "articles concerned" "would be, of course, the aforementioned 'articles that . . . infringe a valid and enforceable United States patent." *Id.* (quoting Section 337(a)(1)(B)(i)). The panel thus interpreted Section 337 subsections (d)(1) and (a)(1)(B)(i) as referring to the same "articles."

The panel's reasoning evidences a misunderstanding of enforcement statutes like Section 337. The "articles" of subsections (a) and (d)(1) are not the same. Subsection (a) defines unfair trade acts. When the Commission determines that one of these unfair trade acts has occurred, it provides injunctive relief to prevent future unfair trade acts according to subsection (d)(1). An exclusion order issued under subsection (d)(1) does not affect the articles that gave rise to the unfair trade act, *e.g.*, the "articles that infringe." Those articles have already been imported, and thus cannot be excluded from entry into the U.S. Rather, like all forms of injunctive relief, an exclusion order prevents future illegal acts from occurring by, for example, preventing similar articles from entering the U.S.

Accordingly, we hold that Congress has not directly answered whether goods qualify as "articles that infringe" when the Commission has found that an importer used such goods, after importation, to directly infringe at the inducement of the goods' seller.

## B. *Chevron* Step Two

Because Section 337 does not answer the precise question before us, we consider whether the Commission's interpretation of Section 337 is reasonable. The Commission's interpretation "prevails if it is a reasonable con-

struction of the statute, whether or not it is the only possible interpretation or even the one a court might think best." *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012). For the reasons explained below, we find the Commission's interpretation consistent with the statutory text, policy, and legislative history of Section 337. We thus find the Commission's interpretation reasonable.

### 1. Statutory Text

The Commission's interpretation is consistent with the statutory text, for reasons we have already suggested. Induced infringement is one kind of infringement, and when it is accomplished by supplying an article, the article supplied can be an "article that infringes" if the other requirements of inducement are met. Liability for inducement must be predicated on a finding of direct infringement. *Limelight*, 134 S. Ct. at 2117. Yet direct infringement commonly occurs after inducement. Liability for inducement nevertheless attaches as of the time of the inducing activity, provided that direct infringement eventually occurs. *Standard Oil*, 754 F.2d at 348. The Commission's interpretation recognizes that the acts necessary for induced infringement, including acts of direct infringement, may not occur simultaneously at the time of importation. In many cases, such acts cannot occur at the time of importation. In that context, the Commission's interpretation that Section 337 grants it authority to prevent importation of articles that have been part of inducement as an unfair trade act is consistent with the statutory phrase "articles that infringe."

The Commission's interpretation is also consistent with the text of Section 337 as a whole. *See Holder*, 132 S. Ct. at 2017 (finding an agency's interpretation consistent with statute's text, and thus reasonable). Section 337 contemplates that infringement may occur *after* importation. The statute defines as unlawful "the sale

within the United States after importation . . . of articles
that—(i) infringe . . . ." § 337(a)(1)(B)(i).  The statute thus
distinguishes the unfair trade act of importation from
infringement by defining as unfair the importation of an
article that will infringe, *i.e.*, be sold, "after importation."
*Id.*    Section 337(a)(1)(B)'s "sale . . . after importation"
language confirms that the Commission is permitted to
focus on post-importation activity to identify the comple-
tion of infringement.

### 2.  Legislative History and Statutory Policy

Nothing in nearly a century of U.S. trade law enact-
ments is inconsistent with the Commission's interpreta-
tion.    The legislative history consistently evidences
Congressional intent to vest the Commission with broad
enforcement authority to remedy unfair trade acts.  The
United States Tariff Commission ("Tariff Commission"),
the predecessor to the Commission, was established in
1916.  Pub. L. No. 64-271, 39 Stat. 795 (1916).  From its
creation, a fundamental purpose of the Tariff Commission
was to prevent a diverse array of unfair methods of com-
petition in the importation of goods.[5]  Recognizing the
challenges posed by the wide array of unfair methods of
competition, Congress emphasized the broad scope of the
enforcement powers granted to the Tariff Commission
when it passed the 1922 Tariff Act.  With respect to
Section 316 of the 1922 Tariff Act, the precursor to Sec-
tion 337, Congress explained that the "provision relating
to *unfair methods of competition* in the importation of
goods," was "broad enough to prevent *every type and form*

---

[5]    Unfair methods of competition have included
dumping, subsidies, safeguards, anticompetitive practices,
and violations of intellectual property rights, all involving
the cross-border movement of goods, *i.e.*, articles.  *See,
e.g.*, 42 Stat. 935-36, 943 (1922).

of unfair practice . . . ." S. Rep. No. 67-595, at 3 (1922) (emphasis added).

In the Tariff Act of 1930, Congress superseded Section 316 with Section 337, but did not alter the Tariff Commission's broad authority to address every type and form of unfair trade practice. *See* Pub. L. No. 71-361, 46 Stat. 590 (1930). Section 337 "provides broadly for action by the Tariff Commission in cases involving 'unfair methods of competition and unfair acts in the importation of articles' but does not define those terms nor set up a definite standard." *In re Von Clemm*, 229 F.2d 441, 443 (C.C.P.A. 1955). When Congress used the words "unfair methods of competition and unfair acts in the importation of articles," that language is "broad and inclusive and should not be limited to, or by, *technical definitions* of those types of acts." *Id.* at 444 (emphasis added).

For nearly 35 years, the Commission has embraced its Congressional grant as bestowing authority to investigate and take action under Section 337 based on induced infringement. At least as early as 1980, the Commission was making determinations that inducement to infringe a valid U.S. patent under 35 U.S.C. § 271(b) constituted an unfair trade act under Section 337 that could be remedied by an exclusion order. *E.g.*, *Certain Surveying Devices*, Inv. No. 337-TA-68, USITC Pub. 1085 (July 1980) (Commission Determination). The Commission has persisted in its interpretation of Section 337 to the present day.[6]

---

6    *See, e.g., Certain Inkjet Ink Cartridges with Printheads and Components Thereof,* Inv. No. 337-TA-723, USITC Pub. 4373 (Feb. 2013), 2011 WL 3489151, at *49 (June 10, 2011) (Initial Determination); *Certain Semiconductor Chips Having Synchronous Dynamic Random Access Memory Controllers and Prods. Containing Same,* Inv. No. 337-TA-661, USITC Pub. 4266 (Oct. 2011), Initial Determination at 42, 2011 WL 6017982, at *85 (Jan. 22,

The Commission's consistency supports the reasonableness of its interpretation. *See, e.g., Astrue v. Capato ex rel. B.N.C.*, 132 S. Ct. 2021, 2033 (2012) (noting that agency's reasonable interpretation was "adhered to without deviation for many decades").

Congress has not upset the Commission's consistent interpretation of Section 337.  Indeed, Congress introduced the current statutory language in 1988, after the Commission had adopted this interpretation.  *See* note 6, *supra*.  Congress acted against a backdrop of consistent agency and judicial interpretation emphasizing the breadth of the Commission's authority.  *See, e.g., Von Clemm*, 229 F.2d at 443–44 (the Commission's power to remedy acts of unfair competition is "broad and inclusive"); *In re Orion Co.*, 71 F.2d 458, 467 (C.C.P.A. 1934) (Section 337's prohibition on "unfair methods of competi-

---

2010); *Certain Automated Mechanical Transmission Sys. for Medium–Duty and Heavy-Duty Trucks and Components Thereof,* Inv. No. 337-TA-503, USITC Pub. 3934 (Aug. 2007), Initial Determination at 154, 2007 WL 4473082, at \*101 (Jan. 7, 2005); *Certain Hardware Logic Emulation Systems and Components Thereof,* Inv. No. 337-TA-383, USITC Pub. 3154 (Jan. 1999), Comm'n Notice at 2 (Mar. 6, 1998), Initial Determination at 179, 1997 WL 665006, at \*101 (July 31, 1997); *Certain Molded-In Sandwich Panel Inserts and Methods for Their Installation,* Inv. No. 337-TA-99, USITC Pub. 1246 (May 1982), Comm'n Op. at 8 (Apr. 9, 1982), *aff'd sub nom., Young Eng'rs, Inc. v. Int'l Trade Comm'n,* 721 F.2d 1305 (Fed. Cir. 1983).  We note that we provide, here, only a small portion of the Commission's induced infringement determinations to show that they were made throughout the past 35 years.  A more comprehensive list of the Commission's induced infringement determinations under Section 337 can be found at *Suprema*, 742 F.3d at 1372 n.2.

tion in the importation of goods is broad enough to prevent every type and form of unfair practice") (quoting S. Rep. No. 67-595, at 3 (1922)). There is no indication that Congress, in 1988, meant to contract the Commission's authority regarding patent infringement. To the contrary, Congress said it was expanding Commission authority.

Congress amended Section 337 in 1988, removing the requirement that a complainant must show injury to domestic industry before a violation is found. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) (codified at Section 337(a)(2)-(3)). As a part of this effort, the 1988 Act inserted the phrase "articles that infringe." *Id.* Congress declared its purpose to enhance Commission authority.[7] The "fundamental purpose" of the 1988 amendment was to "strengthen the effectiveness of section 337" against the "importation of articles which infringe U.S. intellectual property rights." H.R. Rep. No. 100-40, pt. 1, at 155 (1987); *see also* H.R. Rep. No. 100-576, at 112 (1988) (Congressional finding that the amendments to Section 337 "make it a more effective remedy for the protection of United States intellectual property rights"). The Com-

---

[7]    "(a) FINDINGS. — The Congress finds that — (1) United States persons that rely on protection of intellectual property rights are among the most advanced and competitive in the world; and (2) the existing protection under section 337 of the Tariff Act of 1930 against unfair trade practices is cumbersome and costly and has not provided United States owners of intellectual property rights with adequate protection against foreign companies violating such rights.
(b) PURPOSE. — The purpose of this part is to amend section 337 of the Tariff Act of 1930 to make it a more effective remedy for the protection of United States intellectual property rights." § 1341, 102 Stat. 1211-1212.

mission's interpretation is consistent with Congress' longstanding, broad policy, and with its broadening purpose in 1988.

This court has consistently affirmed the Commission's determination that a violation of Section 337 may arise from an act of induced infringement. *See, e.g.*, *Young Eng'rs Inc. v. Int'l Trade Comm'n,* 721 F.2d 1305 (Fed. Cir. 1983) (affirming Section 337 violation based on contributory and induced infringement of process patents); *Vizio, Inc. v. Int'l Trade Comm'n,* 605 F.3d 1330 (Fed. Cir. 2010) (affirming Section 337 violation based on induced infringement of method claim); *Emcore Corp. v. Int'l Trade Comm'n,* 449 F. App'x 918 (Fed. Cir. 2011) (affirming without opinion Section 337 violation based on induced infringement of apparatus claim). Prior to this case, none of our reviews of the Commission's determinations have questioned the Commission's authority to investigate and find a violation of Section 337 predicated on an act of induced infringement.

The technical interpretation adopted by the panel weakens the Commission's overall ability to prevent unfair trade acts involving infringement of a U.S. patent. The panel's interpretation of Section 337 would eliminate relief for a distinct unfair trade act and induced infringement. There is no basis for curtailing the Commission's gap-filling authority in that way. Indeed, the practical consequence would be an open invitation to foreign entities (which might for various reasons not be subject to a district court injunction) to circumvent Section 337 by importing articles in a state requiring post-importation combination or modification before direct infringement could be shown.

The Commission reasonably determined that its interpretation would further the purpose of the statute. *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 59 (2011) (purpose of a statute is relevant to

*Chevron* Step Two). Congress enacted a legal regime for enforcement against unfair trade acts by directing the Commission to base Section 337 relief on goods and the issuance of exclusion orders to bar their importation. Absent unconstitutionality, we must defer to that regime. *See, e.g.*, *Beck v. Sec'y of Dep't of Health & Human Servs.*, 924 F.2d 1029, 1034 (Fed. Cir. 1991) ("Our duty is limited to interpreting the statute as it was enacted . . . ."). The Commission adopted a reasonable interpretation under it.

We note that our deference to the Commission's statutory interpretation in this case is hardly momentous. The court has consistently deferred to the Commission, recognizing the Commission's technical expertise in deciding issues arising under Section 337, a statute Congress has entrusted the agency to administer. *E.g.*, *Farrel Corp. v. Int'l Trade Comm'n*, 949 F.2d 1147, 1151 (Fed. Cir. 1991), *superseded by statute*, 19 U.S.C. § 1337(c); *Enercon*, 151 F.3d at 1381–83. We have concluded on several occasions that the court may not substitute its own interpretation of the statute for the agency's reasonable interpretation. *See, e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1360–61 (Fed. Cir. 2007); *Corning Glass Works v. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986). We have routinely deferred to the agency's reasonable interpretation of Section 337. *See, e.g.*, *Enercon*, 151 F.3d at 1383 (affirming the Commission's interpretation of the term "sale for importation" in Section 337 as reasonable); *Kinik*, 362 F.3d at 1363 (deferring to Commission's interpretation of the interplay between Section 337 and 35 U.S.C. 271(g)); *San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n*, 161 F.3d 1347, 1357 (Fed. Cir. 1998) (affirming Commission's reasonable interpretation of § 337(f)(2)).

## CONCLUSION

We hold that the Commission's interpretation that the phrase "articles that infringe" covers goods that were used

by an importer to directly infringe post-importation as a result of the seller's inducement is reasonable. We remand the appeal to the original panel for further proceedings consistent with this opinion.

# United States Court of Appeals for the Federal Circuit

---

**SUPREMA, INC.,
MENTALIX INCORPORATED,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**CROSS MATCH TECHNOLOGIES, INC.,**
*Intervenor*

---

2012-1170

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

---

DYK, *Circuit Judge*, dissenting.

While I fully join Judge O'Malley's dissent, I write separately to emphasize the difference between this case and prior Section 337 cases at the International Trade Commission ("Commission"), and how starkly the Commission's theory of induced infringement differs from its own past practice.

Suprema, Inc. ("Suprema") imports fingerprint scanners to several customers in the United States, including

Mentalix, Inc. ("Mentalix"). Cross Match Technologies, Inc. does not dispute the Commission's finding that Suprema's "scanners and [software development kit, or "SDK"] are capable of substantial non-infringing use." J.A. 229. At the time of importation, the scanners neither directly infringe nor induce infringement of method claim 19 of U.S. Patent No. 7,203,344, the sole remaining claim in this appeal. Instead, these staple articles may or may not ultimately be used to infringe claim 19, depending upon whether and how they are combined with domestically developed software after importation into the United States.

The Commission's Limited Exclusion Order here excluded all fingerprint scanners imported by Suprema or Mentalix "that infringe . . . claim 19," interpreted to mean all scanners imported by Suprema or Mentalix, regardless of how those scanners were later used. Supp. App. 400502. The Commission's theory was that Suprema induced Mentalix's post-importation direct infringement of claim 19. The Commission concedes that "Customs might not be able to determine whether future shipments of Supreme scanners presented for entry infringe claim 19 under § 271(b)," but relies on a finding that some of the imported scanners will ultimately be used by Mentalix to directly infringe to enter an order excluding *all* scanners imported by Suprema or Mentalix. ITC Br. 59.

The government contends that in prior commission decisions it has relied on an inducement theory, and that this case plows no new ground. But as the government conceded at oral argument, in prior cases, the Commission banned staple articles for importation on an inducement theory only in circumstances where inducing instructions were imported alongside an article that was ultimately used to directly infringe in the United States. The Commission's theory was that all of the imported articles infringed because inducing instructions were

included in the importation. Judge O'Malley's dissent correctly points out that the vast majority of these prior Commission cases are distinguishable. But even taking the government's description of those prior cases at face value, there was no such finding of instructions imported alongside the scanners here.[1] Instead, the Commission relied solely on Suprema's alleged intent to induce, citing evidence that Suprema collaborated with Mentalix to integrate Mentalix's software with Suprema's scanners *after* the articles were imported into the United States.

It is a far different matter where, as here, any inducement is separate from the importation, and the articles as imported may or may not ultimately be used to directly infringe a method claim when combined with software post-importation.

The Commission's notion that it can nevertheless exclude all of the scanners imported by Suprema because the Exclusion Order allows the importer to certify that certain of the staple articles will not ultimately be used to infringe reads the statute exactly backwards. The statute covers only "articles that—infringe," 19 U.S.C. § 1337(a)(1)(B), and does not allow the Commission to

---

[1] The majority notes that the scanners ship "with an instruction manual that explains how programs can be written to take advantage of scanner functionality." Maj. Op. at 6. But that is not the same as instructions directed to infringement of method claim 19, and neither the administrative law judge nor the Commission found that these manuals contained instructions that induced infringement of claim 19, nor even mentioned the instructions in the inducement analysis. *See* J.A. 212 ("The SDKs include manuals as well as dynamic link libraries ('dlls') that include functions that operate various features of the accused fingerprint scanners.").

enter an exclusion order directed to all of the subject articles, even those that ultimately may never be used to infringe, on the theory that some of the articles may be used in an infringing manner after importation.

# United States Court of Appeals for the Federal Circuit

---

**SUPREMA, INC.,
MENTALIX INCORPORATED,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**CROSS MATCH TECHNOLOGIES, INC.,**
*Intervenor*

---

2012-1170

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

---

O'MALLEY, *Circuit Judge*, dissenting, with whom PROST, *Chief Judge*, LOURIE and DYK, *Circuit Judges*, join.

The majority today authorizes the International Trade Commission ("Commission") to bar the importation of articles of commerce that may or may not be later used by third parties to infringe a method patent, based only on the putative intent of the importer. And, it does so in circumstances in which it is undisputed that the patented method cannot be practiced unless the imported article is used in combination with software neither embedded in the imported article nor sold by the importer. Because 19

U.S.C. § 1337 unambiguously fails to provide the Commission with the authority the majority endows on it, I respectfully dissent.

The majority justifies its decision on two grounds: (1) policy concerns regarding the desire to protect United States patent holders from unfair competition; and (2) deference to the Executive agency's view of how best to fulfill its role in regulating "international commerce". But we are not the appropriate audience for policy concerns except to the extent we are charged with enforcing the policy articulated in the statutory scheme Congress actually adopted. When Congress provides us with clear instructions, we are to follow those instructions regardless of our own policy preferences. Deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is not to be used as a substitute for statutory interpretation. This is especially true when, as here, the interpretation proffered by the agency "makes scant sense." *Mellouli v. Lynch*, 135 S. Ct. 1980, 1989 (2015).

Like us, the Executive may not expand the limited powers afforded to it by Congress under the guise of "deference". At the Executive's invitation, the majority strains to find an ambiguity in the statute where there is none, just so it may resort to the protective umbrella of *Chevron*. Although the majority says it is concerned about importers taking advantage of an apparent gap in the statute, any gaps should be filled by Congress, not by us or the Commission. The patent holder here is well protected under the patent laws—having the ability to stop the only entity practicing its patented method from doing so in an action in district court under 35 U.S.C. § 271(a), and the ability to seek damages from any importer acting with an intent to induce that entity to so act. We should not rewrite the trade laws out of a desire to enhance that remedy.

## I. THE LANGUAGE OF THE STATUTE

Our analysis of the scope of § 1337 must begin with the language of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, our analysis begins with the language of the statute." (internal quotation marks omitted)) The Commission is itself a creature of statute, and its authority to issue an exclusion order must emanate from a statutory grant of power. *See Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir. 2008). Under the familiar framework of *Chevron*, as the majority correctly notes, we only defer to the agency's construction of the statute if the statute in question is ambiguous. If "Congress has directly spoken to the precise question at issue," our "inquiry is at an end"; we are to "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. Here, Congress—not the panel decision in this case—explicitly chose to exclude liability under § 1337 for induced infringement of a method claim that is not directly infringed, if at all, until after importation. We therefore do not afford the Commission's construction any deference.

Section 1337(a), in relevant part, states that:

(1) Subject to paragraph (2), the following are unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provision of law, as provided in this section:

> (A) Unfair methods of competition and unfair acts in the importation of articles . . . into the United States . . .

> (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—

> (i) infringe a valid and enforceable United States patent . . .
>
> (ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.

The key language is "articles that—infringe." Because the majority finds this language to be ambiguous, it concludes that we must defer to the Commission's interpretation. Maj. Op. at 15–18. The majority fails, however, to identify an actual ambiguity in the statute. The word "articles" is not ambiguous—it has a well-defined legal definition. *See* Black's Law Dictionary 160 (7th ed. 1990) (defining "article" as "[g]enerally, a particular item or thing"); *see, e.g.*, *also Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2041–42 (2012) (looking to dictionary definitions to define the "normal usage" of a statutory term). The word connotes a physical object. And, Congress itself has defined "infringe" in 35 U.S.C. § 271. *See, e.g.*, 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.").

We thus turn to the surrounding statutory text to determine what forms of infringement outlined in § 271 support liability under § 1337(a)(1)(B)(i).[1] *See, e.g.*, *Yates*

---

[1] The majority asserts that Suprema failed to demonstrate a "clearly established usage" of "articles that —infringe" "limited to product claims or to direct or contributory infringement." Maj. Op. at 16–17. The *plain language* of the statute is all that is necessary to deter-

*v. United States*, 135 S. Ct. 1074, 1081–82 ("Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))). Congress specifically limits § 1337(a)(1)(B)(i) to the "importation into the United States, the sale for importation, or the sale within the United States after importation . . . ." It is objects which are imported or sold, not methods. As the Commission correctly ascertained in *Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, USITC Inv. No. 337-TA-724, 2012 WL 3246515, at \*12–13 (Dec. 21, 2011) (Final), moreover, its focus under the statute must be on the point of importation, and patented methods generally are not directly infringed until their use in the United States after importation. Both "importation into the United States" and "sale for importation" identify the point of importation as the cornerstone of liability. Indeed, the use of present tense verbs in the statutory language, i.e. "importation"

---

mine its meaning. Indeed, the Commission itself has limited the scope of "articles that—infringe" with regard to direct infringement of method claims, relying on the statute and common parlance, without reference to "clearly established usage" of "articles that—infringe." *See Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, USITC Inv. No. 337-TA-724, 2012 WL 3246515, at \*12–13 (Dec. 21, 2011). Loose phraseology in our prior opinions does not change the words Congress explicitly chose in § 1337(a)(1)(B)(i).

and "sale", supports a natural reading of the statute—that infringement is tied, not just to a physical object, but to the date of importation. *Cf. Carr v. United States*, 560 U.S. 438, 462 (2010) (Alito, J., dissenting) ("Congress's use of the present tense is unambiguous, and the statutory language accordingly should be the end of the matter.").

The exceptions to this importation-centric rule are specified in § 1337(a)(1)(B)(i) and § 1337(a)(1)(B)(ii). "[T]he sale within the United States after importation" in § 1337(a)(1)(B)(i) raises considerations of post-importation conduct, but Congress specifically limited this to "sale", which does not apply to methods. We have long held that "use" in § 271(a) covers infringement of method claims. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) ("Congress has consistently expressed the view that it understands infringement of method claims under section 271(a) to be limited to use."). But "use" appears nowhere in § 1337(a)(1)(B)(i). We expect that Congress speaks in precise terms when defining liability, and the absence of "use" in § 1337(a)(1)(B)(i) is highly conspicuous. Section 1337(a)(1)(B)(ii) expressly covers importation of products made using infringing processes prior to importation. The need to include § 1337(a)(1)(B)(ii) demonstrates that Congress did not intend for § 1337(a)(1)(B)(i) to extend beyond tangible "articles" to intangible methods, particularly where future infringement of such methods is uncertain at the time of importation. Congress identified the situations where our focus should leave the point of importation, and the majority errs in grafting "use" into the language of the statute where it does not appear.

This makes practical sense; there is no actual harm to a patentee until an infringing use, and that harm only occurs after importation for method claims such as the ones at issue in this appeal. This is especially true for staple goods like Suprema's scanners, where a broad

asserting of the Commission's power could prevent non-infringing goods from entering the country on the basis of what a customer *may* do with that item once it enters U.S. territory. Such considerations are the purview of the district courts, and fall outside the limited statutory jurisdiction of the Commission.

The Commission and the majority instead rely on an inducement theory under § 271(b). But as the Supreme Court recently reminded us, "our case law leaves no doubt that inducement liability may arise 'if, but only if, [there is] . . . direct infringement.'" *Limelight Networks, Inc. v. Akamai Techs, Inc.*, 134 S. Ct. 2111, 2117 (2014) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961)). Evidence of direct infringement—that all claimed steps of the method have been performed—is a predicate for a finding of inducement liability under § 271(b). When the Commission attempts to enforce an exclusion order under § 1337(a)(1)(B)(i) on grounds that an importer or customer may later complete steps of a method claim post-importation, a necessary predicate of § 1337(a)(1)(B)(i) is missing—there are no "articles that—infringe" because there is no infringement. Although the importer's specific intent to cause infringement may exist at the time of importation (a point Suprema contests here), the "articles that—infringe" do not. The Commission would have the power to institute an exclusion order under § 271(b) if, at the time of importation, there was evidence of both specific intent *and* the existence of an article that itself directly infringed. *See, e.g.*, *Kyocera*, 545 F.3d at 1346. But in that situation, the Commission could also justify the exclusion order on the basis of § 271(a). As we have described, however, the opposite is not true— § 1337(a)(1)(B)(i) does not permit the Commission to

institute an exclusion order solely on § 271(b) when there is no direct infringement at the time of importation.[2]

Congress did not, in either § 1337(a)(1)(B)(i) or § 271, grant the Commission the power to issue an exclusion order on the basis of the importer's intent to induce possible infringement after importation. If Congress had sought to grant the Commission the power to issue an exclusion order based on an importer's *intent* to cause direct infringement at a later time, it would have said so. Congress could have used language similar to the "unfair methods of competition and unfair acts" language of § 1337(a)(1)(A), broadly sweeping in such an intent to induce infringement. Instead, in 1988, Congress defined prohibited acts related to patent infringement in § 1337(a)(1)(B)(i) through a categorical approach that does not include the possibility of post-importation infringement of method claims. Omnibus Trade & Competitiveness Act of 1988, Pub. L. No. 100–418, tit. I, 102 Stat. 1211–12. We are not at liberty to impute power to the Commission that Congress did not grant.

By permitting indirect infringement liability at the point of importation when there has been no direct infringement, the majority crafts patent policy where it believes there is a loophole ripe for abuse. *See* Maj. Op. at 25–26. As the Supreme Court recently reminded us, however, "[t]he courts should not create liability for inducement of non-infringing conduct where Congress has

---

[2]    Thus, even though this court has used the term "infringement" to generically describe any acts under § 271, Maj. Op. at 15 (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001)), that usage does not somehow alter how we should interpret "infringe" *within the context of the statutory scheme* of § 1337.

elected not to extend that concept." *Limelight*, 134 S. Ct. at 2118. As discussed later, moreover, the majority creates the possibility for an alternative type of abuse—or at least unnecessary confusion. As the Commission concedes, its exclusion orders are enforced at the border by Customs agents. Thus, Customs agents are charged with deciding which scanners may later be used by some Suprema customers in an infringing manner and, as to those, for which customers Suprema has acted with an improper intent to induce that infringement. Thus, although the majority states in its first footnote that scanners going to customers other than Mentalix are not relevant to the issue before us, Maj. Op. at 6 n.1, that is not the case.

The language of the statute is unambiguous—the Commission lacks the power under § 1337(a)(1)(B)(i) to enter an exclusion order on the basis of infringement of a method claim when the underlying direct infringement occurs post-importation.

## II. THE MAJORITY'S CONSTRUCTION

The majority, the appellees, and the government read § 1337(a)(1)(B)(i) differently. They argue that the *in rem* nature of the Tariff Act and the *in personam* nature of the Patent Act are inherently incompatible. Maj. Op. at 15–18. Because, they say, only a person, and not an article, can infringe, the majority reasons that the combination of § 1337(a)(1)(B)(i) and § 271 is necessarily ambiguous, and we must therefore defer to the Commission's reasoned interpretation of the Tariff Act under *Chevron*.[3] Maj. Op.

---

[3]    The majority does not argue that the use of "articles" in § 1337(a)(1)(B)(i) is so fundamentally incorrect or creates such unanticipated results as to trigger the absurdity doctrine. *See, e.g., United States v. Kirby*, 74 U.S.

at 15. The majority also focuses on the history of the Tariff Act and statements made in the legislative record, arguing that a 1988 amendment to the Tariff Act ratified a consistent pre-amendment application of § 271(b) to method claims under § 1337(a)(1)(B)(i). Neither of these justifications is compelling.

## A. The Lack of Ambiguity

The majority's presumed ambiguity in the combination of § 1337(a)(1)(B)(i) and § 271(b) seems to be merely a means to the end to which it arrives—resort to *Chevron* step 2. We should not read statutes to create an ambiguity in light of clear congressional statements, even if that result may lead to what some parties consider a normatively more fair result. *See, e.g.*, *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 524 (1992) (White, J., dissenting) ("To conclude otherwise is to resort to 'ingenuity to create ambiguity' that simply does not exist in this statute." (quoting *Rothschild v. United States*, 179 U.S. 463, 465 (1900))); *cf.* Antonin Scalia & Bryan A. Garner, Reading Law § 27 (2012) ("Hence there can be no justification for needlessly rendering provisions in conflict if

---

482, 486–87 (1868). The majority instead appears to be arguing that § 1337(a)(1)(B)(i) is ambiguous in this particular situation because the application of § 271(b) to post-importation conduct does not provide for a clean analogue under § 1337(a)(1)(B)(i). Maj. Op. at 15 ("Simply put, the phrase 'articles that infringe' does not map onto the Patent Act's definition of infringement."). This purported inconsistency does not prove that Congress intended to leave the interpretative decision to the Commission, it merely demonstrates congressional intent not to include such conduct under the scope of § 1337(a)(1)(B)(i). *FDA v. Brown & Williamson Tobacco Corp*, 529 U.S. 120, 159 (2000).

they can be interpreted harmoniously.") (hereinafter Scalia & Garner).

Section 1337(a)(1)(B)(i) speaks in terms of "articles that—infringe." The majority says that this is not how we naturally refer to infringement under § 271—that we normally think in terms of a person or entity doing the infringing. The majority claims that this "disparity" requires that the Commission, and not our court, resolve the "uncertainty." Maj. Op. at 15–16. This argument—newly asserted by the government in this en banc proceeding—lacks logical grounding. Although it is people who are liable for infringement under the law, it is the underlying article or methods that are the focus of an infringement analysis. It is to the aspects of articles that are manufactured, sold, or offered for sale or methods that are "used" that an element-by-element comparison with the patent claims is made. Multiple subsections of § 271 tie conduct directly to an article. For example, § 271(a) defines infringement as conduct involving the "mak[ing], us[ing], offer[ing] to sell, or sell[ing] any patented invention." The "patented invention" of § 271(a) is the equivalent to the "article" in § 1337(a)(1)(B)(i). In the one situation where this analogy breaks down—method claims—the Commission has not said that the statute is inexorably ambiguous, it has instead concluded that § 1337(a)(1)(B)(i) does not apply to post-importation conduct that infringes method claims. *Certain Electronic Devices*, 2012 WL 3246515, at *12. And, § 271(c) ties contributory infringement to conduct involving "a component of a patented machine, manufacture, combination or composition." Similar to § 271(a), this "component" is the equivalent to the "article" in § 1337(a)(1)(B)(i).

Section 271(b) has no similar analogue. Induced infringement focuses on conduct tied to another *infringer*, not to an "article," "patented invention," or "component." *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer.").

We have clarified that, in an induced infringement analysis, we focus on the *conduct* of the inducer and not the article itself. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) ("[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."); *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) ("To succeed [on a theory of induced infringement], a plaintiff must prove that the defendants' actions induced infringing acts and that they knew or should have known their actions would induce actual infringement." (internal quotation marks and alterations omitted)). Any consideration of the "article" in an inducement analysis comes only as part of the requisite direct infringement under § 271(a). As discussed above, the Commission has already concluded that § 1337(a)(1)(B)(i) does not premise liability on post-importation conduct found to infringe a method claim.

The fact that Congress spoke in terms of "articles" instead of "infringers" in § 1337(a)(1)(B)(i) is not evidence that Congress was confused or sought to implicitly delegate the decision of what an "article—that infringes" is to the Commission. *King v. Burwell*, 135 S. Ct. 2480, 2488–89 (2015) (explaining that we should not nonchalantly defer to an agency's interpretation for questions of "deep economic and political significance" (internal citation omitted)). It, instead, indicates Congress's determination that Customs's decision-making at the border should be tied to a tangible object—i.e., an "article"—not an intangible consideration—i.e., the importer's intent. Although the Commission may be required to consider the importer's intent in its analysis, it will only be as a corollary to a finding of direct infringement at the point of importation. Under § 1337(a)(1)(B)(i), intent cannot be divorced from the direct infringement. *See Limelight*, 134 S. Ct. at 2118 (explaining that separating § 271(b) from § 271(a) "would

require the courts to develop two parallel bodies of infringement law: one for liability for direct infringement, and one for liability for inducement."). The majority continues to "fundamentally misunderstand[] what it means to infringe a method patent." *Id.* at 2117.

The majority counters that an unambiguous construction of the statute "to require that infringement occur at the time of importation" would produce "absurd results under the pre-1994 version of § 271(a)," because, pre-1994, § 271(a) did not define importing a patented invention as an infringing act. Maj. Op. at 18. The majority, however, ignores that § 1337(a)(1)(B)(i) explicitly considers the "sale within the United States after importation," which means that Section 337 would "have reached even garden-variety direct infringement" that occurs through infringing sales within the United States. Maj. Op. at 18. Congress also amended § 271 in 1988 by adding § 271(g) to cover the importation of an article made by a patented process as an act of infringement. Omnibus Foreign Trade & Competitiveness Act of 1988, Pub. L. No. 100–418, § 9003, 102 Stat. 1107. And, the domestic industry was not without recourse, as it could still seek to invoke § 1337(a)(1)(A) as it had done before the 1988 Amendments because, under the majority's interpretation, those articles would not have been "articles that—infringe" under § 1337(a)(1)(B)(i). The 1994 Amendments to § 271, as part of the legislation necessary to effectuate the Uruguay Round Agreements, Uruguay Round Agreements Act, P.L. No. 103–465, 108 Stat 4809 (1994), demonstrate that Congress recognized the importance of clearly tying infringement to the point of importation, strengthening both the power of the district courts and the Commission explicitly. Even if the majority's "absurd result" theory were true, moreover, we would still be required to give effect to the language Congress chose in 1988 to describe the Commission's *current* power to control imports at the point of importation. *See, e.g.,*

*Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("A change in the language of a statute is generally construed to import a change in meaning . . . .").

"It is . . . our task to determine the correct reading" of § 1337(a)(1)(B)(i) in light of § 271, and we cannot pass this task to the Executive Branch where Congress is unambiguous. *Burwell*, 135 S. Ct. at 2489. Congress provided the Commission with clear instructions: the Commission may bar the importation of any articles that could be found to be infringing under the Patent Act at the time of importation. *See* 19 U.S.C. § 1337(a)(1)(B)(i). Claims of induced infringement predicated on the potential completion of all steps of a method claim after importing the article do not meet this requirement under the plain language of the statute. There is no need to rely on the Commission's interpretation in light of the clear statutory language in § 1337(a)(1)(B)(i).

## B. Legislative History

Failing to find a clear statement in the language of the statute that would support their interpretation of § 1337(a)(1)(B)(i), the majority relies on its own reading of the legislative history. Maj. Op. at 21–25. Putting aside the extent to which reliance on statements in legislative history have limited value when engaging in statutory interpretation, the history of the Tariff Act does not support the majority's expansive interpretation of § 1337(a)(1)(B)(i).

From its inception in 1916, the Commission administered a predecessor to modern § 1337. Section 316 of the 1922 Tariff Act declared that "unfair methods of competition and unfair acts in the importation of articles into the United States . . . the effect or tendency of which is to destroy or substantially injure an industry . . ." were

unlawful.  Ch. 386, 42 Stat. 858, 943 (1922).  This presumably included patent infringement as an "unfair method of competition" or an "unfair act."  *See, e.g.*, *Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247, 257 (C.C.P.A. 1930).  Congress reenacted § 316 as § 337 in the Tariff Act of 1930.  Pub. L. No. 71–361, § 337, 46 Stat. 590, 703–04 (1930).  Similar to § 316, § 337 stated that "[u]nfair methods of competition and unfair acts in the importation of articles into the United States . . . the effect or tendency of which is to destroy or substantially injure an industry . . ." were unlawful.  *Id.*; *see also In re Orion Co.*, 71 F.2d 458, 463 (C.C.P.A. 1934) (explaining that § 316 of the Tariff Act of 1922 "was the prototype of section 337 of the Tariff Act of 1930, and is, in substance, the same").  Unsurprisingly, our predecessor court held that the prohibition on "unfair method[s] of competition" or "unfair act[s]" in § 337 also applied to patent infringement.  *Orion*, 71 F.2d at 464–65.

Section 337 remained largely unchanged until 1988, when Congress substantively amended the Tariff Act to its present form.  Omnibus Foreign Trade & Competitiveness Act of 1988, Pub. L. No. 100–418, 102 Stat. 1107.  In § 1342 of the Act, Congress amended § 337 to split the analysis of "unfair methods of competition and unfair acts."  Under § 1337(a)(1)(A), an exclusion order based on general unfair methods of competition and unfair acts required a finding of substantial injury to the industry, as in the 1922 and 1930 Acts, but under § 1337(a)(1)(B), an exclusion order predicated on the importation of "articles that—infringe" no longer required a showing of substantial injury to the industry.  *Id.* § 1342, 102 Stat. at 1212.  Thus, in 1988 Congress explicitly created a limited exception for imports that violated patent rights by removing the requirement of proving a substantial injury to the domestic industry.  But it did not remove the focus on "articles" that was present in the 1922 and 1930 Acts; it reinforced it.

The majority and the government rely too heavily on very general statements in the legislative history of the 1988 Act when they claim that Congress somehow meant in that Act to authorize the Commission to base exclusion orders on *any* possible injury to domestic industry. In particular, the majority fails to explain why, if there had been a consistent Commission practice regarding exclusion orders predicated solely on an intent to induce infringement as they claim, and the only substantive change to § 1337(a)(1)(B) was removing the domestic injury requirement, Maj. Op. at 24, Congress adopted the "articles that—infringe" moniker. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

The majority and the government point to a portion of the 1988 Amendments discussing congressional fact-findings in support of their argument that Congress intended that § 1337(a)(1)(B) maintain a broad scope. Maj. Op. at 24–25 & n.7 (referring to this language as "consistent with Congress' longstanding broad policy, with its broadening purpose"). Section 1341 of the 1988 Act, titled "Findings", states that "the existing protection under section 337 of the Tariff Act of 1930 . . . is cumbersome and costly and has not provided United States owners of intellectual property rights with adequate protection . . . ." 102 Stat. at 1211–12. And, the majority references statements in the House Reports explaining that the purpose of the 1988 amendments was to strengthen the Tariff Act and make it more effective. Maj. Op. at 24–25 (citing H.R. Rep. No. 100–40, at 155 (1987) and H.R. Rep. No. 100–576, at 112 (1988)). Similarly, the government cites language from the Senate Report, to support the argument that the 1988 Amendments were intended to "strengthen" the enforcement of patent rights. Br. of Int'l Trade Comm'n at 13 (citing S. Rep. No. 100–71, at 128 (1987)). These statements,

however, do not imply that Congress intended for § 1337(a)(1)(B) to cover claims of induced infringement at the time of importation when the requisite direct infringement would not occur until after importation and might never occur at all.

Rather, by removing the domestic injury requirement for exclusion orders based on patent infringement, Congress eliminated one of the most "cumbersome and costly" aspects of seeking an exclusion order—proof of substantial injury to the domestic industry. 102 Stat. at 1211–12. Thus, all the statements to which the majority and government point regarding the need to strengthen protection of domestic patent rights point to the elimination of the substantial injury to domestic industry requirement; they do not justify the conclusion that Congress intended to imbue the Commission with the authority to do whatever it thinks will provide the broadest protections to patentees, regardless of its statutory charge. Statements in the legislative history should not be used to create ambiguity in an already clear statute, especially not legislative history that is as vague as that relied on by the majority here. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."). Congress strengthened the power of patent holders to assert their rights, not by expanding § 271, but by removing a procedural hurdle under § 1337(a).

## C. Historical Commission Practice

The majority and the government also assert that the statutory and legislative history supports its interpretation by demonstrating Congress's intent to continue an unbroken practice by the Commission of predicating exclusion orders on acts of induced infringement. Maj. Op. at 21–23. Specifically, it states that "Congress has not upset the Commission's consistent interpretation of Section 337." Maj. Op. at 23. There has been no interpre-

tation of § 337 that mirrors that adopted by the majority today, however, and certainly nothing so clear that Congress should be charged with jumping in to stop it. The cases the majority cites to support the sweeping statements it makes about the Commission's unbroken practices do not bear the weight placed on them. Indeed, the government conceded as much at oral argument. *See* Oral Argument at 1:12–1:13, *Suprema, Inc. v. International Trade Comm'n*, No. 12-1170 (en banc), *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 12-1170_252015.mp3.

The majority cites a single pre-1988 case in support of its "consistency theory": *Young Engineers, Inc. v. U.S. International Trade Commission*, 721 F.2d 1305 (Fed. Cir. 1983).[4]   *Young Engineers* did not involve an exclusion

---

[4]    The government relies heavily on *Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247 (C.C.P.A. 1930), to establish that the Commission had previously based exclusion orders on induced infringement. *See, e.g.*, Br. of Int'l Trade Comm'n at 28–30, 32. *Bakelite* does not stand for what the government claims, however. The exclusion order in *Bakelite* was predicated on a finding that the imported articles were "prepared and manufactured in conformity" with the patented methods *before* being imported, which is consistent with the later-enacted prohibition on goods produced using patented methods prior to importation in § 1337(a)(1)(B)(ii). *Id.* at 507; *see also In re Orion*, 71 F.2d at 466–67 (finding that the import of products produced using infringing methods abroad could be considered an unfair method of competition or unfair act under the Tariff Act of 1930). *Bakelite* simply does not stand for the proposition that an exclusion order can be issued on the basis of induced infringement where the underlying direct infringement of a

order predicated exclusively on a finding of induced infringement. The Commission issued an exclusion order both because of a finding of direct infringement due to the importation of an infringing product, and induced infringement on the basis of the importer providing "training and assistance to [ ] customers in the use of the inserts in accordance with the patented methods." *In re Certain Molded-In Sandwich Panel Inserts and Methods for Their Installation*, USITC Inv. No. 337–TA–99, 218 U.S.P.Q. 832, at *5 (April 9, 1982), *aff'd*, *Young Eng'rs*, 721 F.2d at 1317. The Commission also concluded that the inserts at issue were not staple goods, and justified the exclusion order on a finding of contributory infringement. *Id.* We affirmed those findings without analysis of the Commission's power to justify exclusion orders solely on a finding of induced infringement. *Young Eng'rs*, 721 F.2d at 1317. *Young Engineers* does not evidence that we have "consistently affirmed the Commission's determination that a violation of Section 337 may arise from an act of induced infringement." Maj. Op. at 25. At best, *Young Engineers* and *Bakelite*, see *supra* note 4, stand for the uncontroversial premise that the Commission can exclude either: (1) articles made using a patented method overseas pre-importation; or (2) non-staple goods imported into the United States on the basis of a finding of direct *and* induced infringement. In either situation, a Customs agent is not required to divine the importer's intent to determine if there would be a potential downstream direct infringement. The direct infringement either already occurred prior to importation (and is statutorily covered under § 1337(a)(1)(B)(ii)) or the good itself could not be used in a non-infringing manner. This is a far cry from

---

method claim occurs *after* importation, and might not occur at all. Unsurprisingly, the majority does not even attempt to rely on *Bakelite*.

establishing a consistent agency practice of which Congress necessarily would have been aware in 1988, as the majority proclaims. Maj. Op. at 21–23.

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345 (Fed. Cir. 1985) does not alter this analysis. In *Standard Oil*, we analyzed when the period for laches would begin to run for claims of induced infringement: at the time of the direct infringement or at the time of the inducing act. *Id.* at 348–49. We concluded that laches barred recovery because the specific intent to induce existed prior to the six-year period for laches, even though the subsequent direct infringement occurred during the laches period. *Id.* *Standard Oil* does not annunciate a rule that induced infringement occurs at the time of the inducing act, see Maj. Op. at 20—we held instead that, *once the direct infringement occurs*, the *liability* for induced infringement is traced back to the inducing act. *Id.*; *see also Nat'l Presto Indus., Inc. v. W. Bend. Co.*, 76 F.3d 1185, 1196 (merely holding that there must be a direct infringement for liability under § 271(b) to exist). Nothing in *Standard Oil* alters the fact or requirement that there must be an underlying direct infringement for there to be induced infringement. *Limelight*, 134 S. Ct. at 2117.

There is simply no evidence of any pre-1988 Commission practice equivalent to the Commission's actions here. Even if reliance on congressional silence were ever a strong reed upon which to premise statutory interpretation,[5] the majority cannot rely on Congress's purported

---

[5] The Supreme Court has recognized that, absent circumstances not present here, congressional silence is, at best, a tenuous ground upon which to justify a particular statutory construction. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) ("Ordinarily,

desire to continue a consistent past agency practice to bolster its statutory construction when the only consistent agency practice was the agency's *failure* to assert § 337 against importers of staple goods based solely on the intent to induce infringement of method claims post-importation.

### D.  Modern Commission Practice

Our post-1988 case law provides no better support for the majority's interpretation.  Although it is unclear which cases the majority believes supports its view, as it cites only two in passing, the government points to two cases that they argue demonstrate the Commission's reliance on § 271(b) in an exclusion order:  *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003), and *Kyocera Wireless Corp. v. International Trade Commission*, 545 F.3d 1340 (Fed. Cir. 2008).  Br. of Int'l Trade Comm'n at 33 n.8.  But neither case required us to determine if an exclusion order could be predicated solely on an intent to induce infringement.

In *Alloc*, the Commission found no infringement, either direct or indirect, in imported flooring products, and we affirmed that determination.  342 F.3d at 1366–68, 1375.  After construing the claims at issue, we agreed with the Commission that there was no evidence of direct infringement.  *Id.* at 1373.  As for induced infringement, we noted that the basis for the allegation of inducement was installation instructions included in the packaging at the time of importation.  *Id.* at 1373–74.  In a short discussion of induced infringement, we found "no reason to

---

'Congress' silence is just that — silence.") (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)); *Johnson v. Trans. Agency*, 480 U.S. 616, 672 (1987) (Scalia, J., dissenting).

disturb the administrative judge's conclusion on induce-
ment" specifically because "the administrative judge
found no evidence of direct infringement."  *Id.* at 1374.
*Alloc* does not demonstrate our approval of the Commis-
sion's use of induced infringement to justify the exclusion
order in the circumstances here, however; our silence
there was not nearly as deafening as the government
believes.   That case did not involve uncertainty as to
future infringement, and there was no challenge to the
Commission's authority regarding inducement claims.  At
best, we merely overlooked this issue in our analysis, and
"I see no reason why [we] should be consciously wrong
today because [we were] unconsciously wrong yesterday."
*Massachusetts v. United States*, 333 U.S. 611, 639–40
(1948) (Jackson, J., dissenting); *cf. Vizio*, 605 F.3d at 1343
(declining to analyze the Commission's authority to base
an exclusion order on induced infringement because
"[a]ppellants do not challenge the Commission's finding of
infringement"); *see also* Maj. Op. at 25 ("Prior to this case,
none of our reviews of the Commission's determinations
have questioned the Commission's authority to investi-
gate and find a violation of Section 337 predicated on an
act of induced infringement.").

   *Kyocera* also fails to provide any support for an inter-
pretation of § 1337(a)(1)(B)(i) that would include induced
infringement of method claims for potential post-
importation direct infringement.  Similar to *Alloc*, there
was no challenge to the Commission's authority regarding
induced infringement allegations; we assumed without
deciding that an exclusion order could be predicated on a
finding of induced infringement under § 1337(a)(1)(B)(i).
*Kyocera*, 742 F.3d at 1353–54; *see also ERBE El-
ektromedizin GmbH v. Int'l Trade Comm.*, 566 F.3d 1028,
1037 (Fed. Cir. 2009) (affirming Commission's determina-
tion of no direct infringement, and therefore concluding
there was "no basis for finding induced or contributory
infringement," without analyzing the Commission's

authority under § 1337(a)(1)(B)(i) to enter an exclusion order due to induced infringement).  Our only discussion of induced infringement involved a short statement remanding the case to the Commission to perform the correct analysis under § 271 after we had altered the specific intent analysis in *DSU*.  *Kyocera*, 742 F.3d at 1354.  Importantly, our appellate review in *Kyocera* did not involve allegations of inducement predicated on potential post-importation direct infringement.  *See In the Matter of Certain Baseband Processor Chips and Chipsets, Transmitter & Receiver (Radio) Chips, Power Control Chips, & Products Containing Same*, USITC Inv. No. 337-TA-543, 2006 WL 3920334, at \*74 (Oct. 10, 2006) (finding that Qualcomm "induces infringement of the apparatus claims" of U.S. Patent No. 6,714,983, but that "Broadcom has not proved that Qualcomm induced infringement of the method claims of the '983 patent").

To the contrary, *Kyocera* involved the importation of wireless devices that were programmed to operate in an infringing manner *prior to being imported*.  *Id.* at 1346 (noting that the Commission only excluded devices from manufacturers who "purchase[d] and incorporate[d] Qualcomm chips into their mobile wireless devices outside the United States, and then imported them into the United States for sale").  Although the Commission relied on an induced infringement theory for infringement of *apparatus claims*, the imported articles directly infringed at the time of importation.  They were the quintessential "articles that—infringe."

Judge Reyna, in his dissent to the panel opinion, highlighted a series of Commission decisions allegedly involving exclusion orders based on an intent to induce direct infringement after importation.  *Suprema, Inc. v. Int'l Trade Comm.*, 742 F.3d 1350, 1372 n.2 (Fed. Cir. 2013).  The majority, as well, appears to rely on those cases through incorporation by reference.  Maj. Op. at 22 n.6 (listing examples and referencing footnote 2 of the dissent

to the panel decision).  But like *Kyocera* and *Alloc*, none of these cases involved a determination by this court that the Commission had the authority to base an exclusion order solely on a finding of an intent to induce possible later infringement.  In fact, in each of these cases, the Commission also found direct or contributory infringement at the time of importation.[6]  None demonstrate a Commission practice consistent with the majority's interpretation.  The government, the Commission, and the majority remain unable to point to any example of the Commission excluding staple goods on the basis of a theory of inducement of direct infringement of method claims post-importation prior to this appeal.

Congress did not intend for Customs agents to need to decipher an importer's intent to induce infringement at some later date.  It, instead, avoided such an unworkable construct by requiring the Commission to issue exclusion orders based on the infringing nature of the article itself.  Prior Commission practice, either pre- or post-1988, lends

---

[6]     *See, e.g.*, *Certain Semiconductor Chips Having Synchronous Dynamic Random Access Memory Controllers and Prods. Containing Same,* Inv. No. 337-TA-661, USITC Pub. 4266, 2011 WL 6017982, at *80–84 (Jan. 22, 2010) (also finding direct and contributory infringement at point of importation); *Certain Automated Mechanical Transmission Sys. for Medium–Duty and Heavy-Duty Trucks and Components Thereof,* Inv. No. 337-TA-503, USITC Pub. 3758, 2007 WL 4473082, at *98–101 (Aug. 1, 2007) (also finding direct infringement at point of importation); *Certain Hardware Logic Emulation Systems and Components Thereof,* USITC Inv. No. 337-TA-383, 1997 WL 665006, at *63–88, 92–99 (July 31, 1997) (also finding direct and contributory infringement at point of importation).

no support to a contrary view. Though we need not reach the legislative history or past Commission practice to perform our duty of saying what the law is for unambiguous statutory language, I am unconvinced that any of the "evidence" upon which the majority relies alters a fair reading of the language that a majority of both houses of Congress agreed to: "articles that—infringe." Indeed, I believe it supports the unambiguous reading that the panel majority found in that statutory language.

### E.  Equitable Considerations

The crux of the majority's holding is equity, and the industry's concern that the plain language of the statute might leave a porous border hospitable to infringers. *See, e.g.* Maj. Op. at 11, 25. But that concern is best addressed to Congress, who chose the words we are interpreting today. The majority minimizes—or ignores—both the power already available to the Commission and the importance of the other source of relief for the domestic industry: district courts.

Behind the majority's strained statutory interpretation is a belief that any construction of § 1337(a)(1)(B)(i) that reduces the Commission's authority to institute exclusion orders would negate the flexibility built into the Tariff Act for remediating harms against the domestic industry. *See* Maj. Op. at 25 ("There is no basis for curtailing the Commission's gap-filling authority in that way."). The majority claims that, under the broad language of the Tariff Act, the Commission *must* have the necessary authority to halt importation of all even potentially infringing goods in order to effectuate Congress's intent in enacting § 1337(a)(1)(B)(i). *Id.* The amici also highlight that, in combination with the Commission's decision not to entertain complaints of direct infringement of method claims under § 271(a), *Certain Electronic Devices*, 2012 WL 3246515, at *12–13, the dissent's construction would render the Commission largely toothless

to stop infringement of method patents. *See, e.g.*, Amicus Br. of Intellectual Prop. Owners Ass'n at 4.

These concerns are overstated. There is little evidence that the Commission would be impotent to stop such importers. The plain language of the statute would not prevent the Commission from predicating an exclusion order on, for example, a non-staple item. This construction also would not prevent the Commission from excluding goods that directly infringe at the point of importation. The Commission has a rich historical practice of excluding such goods, and the "articles that—infringe" language does not diminish the Commission's power. The language of the statute only denies the Commission the power to issue an exclusion order solely on the very limited factual scenario envisioned here—allegations of induced infringement of a method claim based on potential post-importation direct infringement. This interpretation would not open a porous border for all kinds of nefarious actors. At worst, it would limit the Commission's ability to address a situation that has never arisen prior to the present appeal. Our recency bias should not force us to depart from our traditional role in statutory interpretation due to concerns that may or may not ever present themselves again. It certainly should not serve as a justification to abdicate to the Executive all authority over interpretation of § 1337(a)(1)(B)(i).

This desire to give the Commission free rein to prevent potential abuses highlights a more fundamental concern with the majority's approach. The Commission is a creature of statute, with its powers narrowly defined by Congress. *Kyocera*, 545 F.3d at 1355. The Commission is also entirely at the whim of the President (through the United States Trade Representative), who can choose to set aside an exclusion order before it is enforced. 19 U.S.C. § 1337(j)(2). The Commission is therefore subject to the control of the Executive Branch, even though the Commission is nominally an independent agency with

three commissioners from each political party that are appointed by the President upon the advice and consent of the Senate. Congress strictly defines the powers of the Commission, but the President has veto powers over the Commission's assertions of power under § 1337. It is within this framework that we must ardently guard Congress's power to establish the law and our own power to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The majority, however, too easily defers to the Commission's interpretation. By concluding that the statute is ambiguous, the majority emboldens the Executive at the expense of both Congress and this court. As long as we defer to the Commission's interpretation of § 1337, that interpretation may change when the Administration changes. The value and importance of *stare decisis* in statutory interpretation is weakened by undue resort to *Chevron*. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."). The Commission no longer becomes a "creature of statute," but instead a creature of its own making, an ever-expanding hydra that can sprout new areas of authority with each new interpretation.

The majority nominally defers to the Commission because it finds that the statute is ambiguous due to the interplay of § 1337 and § 271(b), even though the language of § 1337 is clear on its face. Maj. Op. at 14–18. But the majority agrees with the Commission in part because it believes the Commission's interpretation will prevent the narrow set of abuses described above. Maj. Op. at 24–26. The industry should address its concerns with potential holes in the statute to Congress, not the Commission or the courts. By choosing to fix the purported mistake made by Congress in using "articles that—infringe", the majority oversteps its role, and at the same time weakens that of Congress.

Finally, we must not forget that there is a forum that can provide an appropriate remedy for allegations of induced infringement of method claims based on post-importation direct infringement: district courts. District courts can enter injunctions preventing downstream customers from using the article in an infringing manner. 35 U.S.C. § 283 ("The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent . . . ."). And, unlike the Commission, a district court could award damages for such acts of inducement. *Id.* § 284.

The Commission is an alternative to district courts that acts to supplement the powers of district courts, not a substitute for district courts when the district court is not as convenient a forum or the remedy sought is more difficult to obtain. Indeed, as noted previously, the Commission itself has determined that it does not have power over allegations of direct infringement of method claims at the point of importation. *Certain Electronic Devices*, 2012 WL 3246515, at *12–13. This does not mean those allegations can never be heard, they just must be addressed before a district court. Similarly here, § 1337(a)(1)(B)(i) does not grant the Commission power to address assertions of induced infringement of method claims based on post-importation direct infringement. Those claims are not lost forever, they just must be asserted in district court.

Finally, the majority's interpretation of § 1337(a)(1)(B)(i) is not the catholicon it purports to be. Although it will permit the Commission to premise exclusion orders on claims of induced infringement based on threats of post-importation direct infringement, it will also grant the Commission the power to hold up staple goods. By premising Customs's power to exclude goods on the importer's alleged intent for how the goods may be used, goods that can be used in both infringing and non-

infringing ways likely will be denied entry based on the perception that they *could be* used to infringe a method claim, especially considering the broad deference given to Customs agent's decision-making at the border. *See, e.g.*, Amicus Br. of Dell at 22 (citing the deference generally given to Customs agents in enforcing an exclusion order, such as the one issued in the present case, at the border). If those goods are not ultimately used in an infringing manner, the Commission would be acting beyond its powers under the Tariff Act. But that determination cannot be made until the goods have been imported, absent evidence that the goods are non-staple items or that the goods are intended to be used only in an infringing manner. A certification statement by the importer will not solve this problem because any evidence that a customer uses the goods in an infringing manner later, even if unexpected, would trigger concerns that could justify an exclusion order or subject the importer to the threat of severe sanctions. The weighing of competing concerns created by the majority's construction demonstrates why it is Congress, and not our court and certainly not the Commission, which is in the best position to determine the Commission's powers. Congress has made that determination, limiting those powers to "articles that—infringe." That decision may make the domestic industry, and some members of this court, uncomfortable, but that is a debate best left for the branch of our government that should be most amicable to the concerns of industry: Congress.

## III. Conclusion

The plain language of § 1337(a)(1)(B)(i) reveals that Congress did not grant the Commission the power to issue an exclusion order based solely on a finding of induced infringement of a method claim and potential post-importation direct infringement. Neither ambiguous statements from the legislative history nor vague and non-determinative prior Commission statements detract

from this analysis.  The majority's attempt to shoehorn the language of § 1337(a)(1)(B)(i) into a strained interpretation of the statute under the guise of deferring to the Commission's interpretation may prevent some rare potential abuses of our patent system, but the majority also opens Pandora's Box.  The majority refers to the original panel interpretation as a "technical interpretation," Maj. Op. at 25, but it should more appropriately be coined "the interpretation mandated by Congress."  Our system of separation of powers guarantees that Congress enacts the laws and we interpret those laws.  The majority here harms both of these aims:  it diminishes Congress's power to define the scope of the Commission's authority, and it permits the Executive Branch to say what the law is.  For these reasons, I respectfully dissent from the majority's interpretation of § 1337(a)(1)(B)(i).